MATTHEW T. GREGORY  # F0205
Attorney General
GREGORY BAKA  # F0199
Deputy Attorney General
OFFICE OF THE ATTORNEY GENERAL
Hon. Juan A. Sablan Memorial Bldg., 2nd Fl.
Caller Box 10007, Capital Hill
Saipan, MP  96950-8907
Telephone:     (670) 664-2341
Fax:           (670) 664-2349
E-mail:        gbaka79@yahoo.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| ANTONIO S. CAMACHO,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, MARIANAS PUBLIC LANDS AUTHORITY,* successor to the Marianas Public Lands Corp., and DEPARMENT OF PUBLIC WORKS,<br><br>　　　　　Defendants.<br>_____ | CIVIL ACTION NO. 05-0043<br><br>**OPPOSITION TO MOTION FOR WRIT OF EXECUTION OR ORDER IN AID OF JUDGMENT**<br><br>Hearing:　Thursday, 28 August 2008<br>Time:　　8:00 a.m.<br>Judge　　Hon. Alex R. Munson |

_____

　　* Under Public Law 15-2, Section 101 (N. Mar. I. Feb. 22, 2006), available at http://www.cnmilaw.org/pdf/public_laws/15/pl15-02.pdf (***Exhibit 1***), most powers and duties assigned to the former Marianas Public Land Authority were assigned to the Department of Public Lands (DPL). See Fed. R. Civ. P. 25(c) ("action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action").

**COME NOW DEFENDANTS** Commonwealth of the Northern Mariana Islands (CNMI); the former Marianas Public Lands Authority (MPLA) through its successor in interest, the Department of Public Lands (DPL); and the Department of Public Works (DPW), and hereby oppose the Plaintiff's motion pursuant to Federal Rule of Civil Procedure 69 and Local Rule 7.1.(b) that a writ of execution issue in favor of Plaintiff Antonio S. Camacho against the Defendants CNMI, the former MPLA, through DPL, and against DPW. Defendants likewise oppose Plaintiff's alternative motion for an Order in Aid of Judgment against the Defendants.

## I. The relief requested against the CNMI is subject to the Covenant.

The Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"), Act of Mar. 24, 1976, Pub.L. 94-241, 90 Stat. 263, reprinted in 48 U.S.C. § 1801 note (2000), provides the framework under which judgments against the CNMI may be enforced. See generally Covenant § 402(a); 48 U.S.C. § 1822(a) (jurisdiction of district court); United States ex rel. Richards v. De Leon Guerrero, 4 F.3d 749, 754 (9th Cir. 1993) ("the authority of the United States arises solely under the Covenant").

By its terms, the Covenant guarantees the CNMI a right to self-government in accordance with a Constitution of its own adoption, Covenant § 103, and a republican form of government with separate executive, legislative, and judicial branches. Covenant § 203(a). Modification of these two provisions by any branch of the United States government requires mutual consent of both the United States and the CNMI. Covenant § 105, second sent.

Federal courts are of limited jurisdiction, meaning that litigants in them must affirmatively establish that jurisdiction exists and may not confer nonexistent jurisdiction

1

by consent or conduct.  Turner v. Bank of North America, 4 U.S. (4 Dall.) 8 (1799); Bingham v. Cabot, 3 U.S. (3 Dall.) 382 (1798); Jackson v. Ashton, 33 U.S. (8 Pet.) 148 (1834); Mitchell v. Maurer, 293 U.S. 237 (1934).

However, assuming valid jurisdiction, "[j]udgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government." Chicago & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 113-114 (1948).  Yet given the availability of post-judgment interest, in an amount eventually to make Plaintiff fully whole and satisfy the judgment, it is necessary to examine the forms upon which a judgment may be executed against a sovereign.

Within the federal context, a rule was rigorously applied until 1933 that an *award of execution* is an essential part of every judgment passed by a court exercising judicial powers and no decision was a legal judgment without an award of execution.  In an 1865 case, the Supreme Court refused to hear an appeal from a decision of the Court of Claims because the act establishing the Court of Claims provided for appeals to the Supreme Court, after which judgments in favor of claimants were to be referred to the Secretary of the Treasury for payments out of the general appropriation for payment of private claims.  The act also provided that no funds should be paid out of the Treasury for any claims "till after an appropriation therefor shall be estimated by the Secretary of the Treasury."  Act of February 24, 1855, 10 Stat. 612, as amended, Act of March 3, 1863, 12 Stat. 737.

The opinion of the Court stated that the implication of power in the executive officer and in Congress to revise all decisions of the Court of Claims requiring payment of money denied that court the judicial power from the exercise of which "alone" appeals could be taken to the Supreme Court.  Gordon v. United States, 69 U.S. (2 Wall.) 561 (1865). Following repeal of the objectionable section, Act of March 17, 1866, 14 Stat. 9, the Court

1 accepted appellate jurisdiction. <u>United States v. Jones</u>, 119 U.S. 477 (1886); <u>De Groot v. United States</u>, 72 U.S. (5 Wall.) 419 (1867). Nevertheless, note that execution of the judgments was still dependent upon congressional appropriations. <u>See generally</u> <u>Glidden Co. v. Zdanok</u>, 370 U.S. 530, 568-571 (1962) (upholding requirement for appropriations at a time when they had to be made for judgments over $100,000). <u>Cf.</u> <u>Regional Rail Reorganization Act Cases (Blanchette v. Connecticut General Ins. Corp.)</u>, 419 U.S. 102, 148-149 & n. 35 (1974).

In 1933, the Court did away with the award-of-execution rule in its rigid form and accepted an appeal from a state court in a declaratory proceeding. <u>Nashville, C. & St. L. Ry. v. Wallace</u>, 288 U.S. 249 (1933). <u>See also</u> <u>Fidelity Nat'l Bank & Trust Co. v. Swope</u>, 274 U.S. 123, 132 (1927) ("While ordinarily a case or judicial controversy results in a judgment requiring award of process of execution to carry it into effect, such relief is not an indispensable adjunct to the exercise of the judicial function.") (unanimously holding that declaratory judgment in state court was *res judicata* in subsequent federal court proceeding). These two decisions removed all constitutional doubts about a proposed federal declaratory judgment act, which was enacted in 1934, 48 Stat. 955, 28 U.S.C. §§ 2201-2202, and unanimously sustained in <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227 (1937).

While these cases reflect the use of the former Award of Execution Doctrine defensively, in attempts to deny jurisdiction over declaratory judgments, the <u>Glidden</u> opinion focuses on the Constitutional underpinnings of the retreat from that doctrine. "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." U.S. Const. art. I, § 9, cl. 7, <u>cited in</u> <u>Glidden Co. v. Zdanok</u>, 370 U.S. at 570 n.34. This vesting of exclusive responsibility for appropriations in Congress was recognized by the Court early, when it held that no execution may issue directed to the

1  Secretary of the Treasury until such an appropriation has been made. <u>Reeside v. Walker</u>,

2  52 U.S. (11 How.) 272, 291 (1852).

> A study concluded in 1933 found only 15 instances in 70 years when Congress had refused to pay a judgment. Note, 46 Harv. L. Rev. 677, 685-686 n. 63. This historical record, surely more favorable to prevailing parties than that obtaining in private litigation, may well make us doubt whether the capacity to enforce a judgment is always indispensable for the exercise of judicial power.

<u>Glidden Co. v. Zdanok</u>, 370 U.S. at 570. The Court did not think judgment enforcement capacity was indispensable when faced with the problem presented by suits for money between States in its original jurisdiction. That jurisdiction has been upheld, for example, in <u>South Dakota v. North Carolina</u>, 192 U.S. 286, 318-321 (1904), notwithstanding the Court's recognition of judicial inability to compel a levy of taxes or otherwise by process to enforce its award. Particularly instructive are the opinions of Chief Justice Fuller and Chief Justice White at the beginning and inconclusive end of the extended litigation between Virginia and West Virginia, 206 U.S. 290, 319 (1907) and 246 U.S. 565 (1918), in which the Court asserted jurisdiction to award damages for breach of contract despite persistent and never-surmounted challenges to its power to enforce a decree. See also the intervening opinions and dispositions: 209 U.S. 514 (1908); 220 U.S. 1, 36 (1911); 222 U.S. 17, 19-20 (1911); 231 U.S. 89 (1913); 234 U.S. 117 (1914); 238 U.S. 202 (1915); 241 U.S. 531 (1916); <u>cited in</u> <u>Glidden Co. v. Zdanok</u>, 370 U.S. at 571 n.35. Indeed, the very reason for the Court ordering the Court of Claims to rely on the good faith of the United States was because "this Court may rely on the good faith of state governments or other public bodies to respond to its judgments." <u>Glidden</u>, 370 U.S. at 571.

While the reason for such federalist deference to the states may be premised on the Tenth Amendment, states retain a significant amount of sovereign authority "only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." <u>Garcia v. San Antonio</u>

Metropolitan Transit Authority, 469 U.S. 528, 549 (1985). The principal restraints on congressional exercise of the Commerce power are to be found not in the Tenth Amendment or in the Commerce Clause itself, but in the structure of the federal government and in the political processes. "Apart from the limitation on federal authority inherent in the delegated nature of Congress' Article I powers, the principal means chosen by the Framers to ensure the role of the States in the federal system lies in the structure of the Federal Government itself." 469 U.S. at 550.

Within the CNMI, the Tenth Amendment is not made applicable, see Covenant § 501(a), and as with the States the federal government maintains paramount sovereignty over the residual sovereignty retained by the Commonwealth. See Covenant § 101. And the CNMI partakes not in the structural benefits enjoyed by the States and relied upon by the Garcia Court. 469 U.S. at 551.

Yet such comity and mutual respect between the federal government and CNMI government is nevertheless enshrined into the Covenant, off-duty Tenth Amendment notwithstanding, by means of the guarantee of a republican form of government, Covenant § 203(a), and the CNMI's right to self-government in accordance with a Constitution of its own adoption. Covenant § 103.

With respect to federal legislation under Covenant Section 105 that may impinge on the Commonwealth's right to self-government, no less than the U.S. Court of Appeals for the Ninth Circuit has held, "To give due consideration to the interests of the United States and the interests of the Commonwealth as reflected in Section 105, we think it appropriate to balance the federal interest to be served by the legislation at issue against the degree of intrusion into the internal affairs of the CNMI." Richards, 4 F.3d at 755 (9th Cir. 1993). Thus, the structure of the Covenant serves the same gentle restraint on federal power over

the CNMI that the Tenth Amendment and the Constitutional structure serve on federal power over the States.

While <u>Richards</u> involved legislative power implemented by the executive branch, the same principles and rationale apply to the federal judiciary, including the Supreme Court's instruction that it (and accordingly, all other federal courts) "may rely on the good faith of state governments or other public bodies to respond to its judgments." <u>Glidden</u>, 370 U.S. at 571.

Such deference by this Court need not be infinite and open-ended, but at the very least it must include a recognition of the interests implicated under the institutional right to self-government guaranteed by Covenant Section 103 and, if such interests are to be outweighed by the interests of the federal judiciary, that they be subjected to the scale of <u>Richards</u> balancing.

**II. The Commonwealth has specific laws dealing with judgments against it.**

What are the interests of the CNMI to be balanced? As with the federal law discussed in <u>Gordon</u>, 69 U.S. 561 (1865) (Act of Feb. 24, 1855, 10 Stat. 612), the Commonwealth likewise has laws limiting disbursements of Commonwealth funds to those appropriated by the legislature.

Such laws are a fundamental attribute of democracy in a republic. Having the house of the legislature most directly representing the people originate expenditure bills, <u>see</u> N.M.I. Const. art. II, § 5(a), ensures that is the citizens of the Commonwealth who determine the policies and priorities regarding spending, not an unbridled executive branch who could otherwise override the will of the people through contracts, personnel actions, unreviewable promises, and constitutional torts.

In a republican form of government, distributions of the common wealth are made through the public servants voted into office and subject to removal if they do not satisfy the ideals and best interests of the electorate. That is democracy in action, and that is what the people of the CNMI chose when they resoundingly approved the Covenant.

If the people of the Marianas wanted independence, they could have created their own currency and paid off judgments in inflated, worthless currency. Instead they chose union with a world power whose currency is still much stronger than most others. A down-side of both our political and judicial systems is that they can be time-consuming. But eventually, the various competing demands will be accommodated and substantial justice done, including payment of interest as necessary.

Federal recognition of and respect for the very limited sovereignty of even municipal governments as instrumentalities of states, see H.R. Rep. No. 95-595, at 263-64 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6221-22, is reflected in the bankruptcy code. As a sovereign entity, there is no bankruptcy option for the Commonwealth government. The CNMI cannot file for bankruptcy under federal law the way a municipality can. See generally 11 U.S.C. §§ 901-46 (Chapter 9 of the Bankruptcy Code).[1] But even for a municipality, such as an instrumentality of the Commonwealth government if statutorily authorized by local law to file for bankruptcy, Section 904 of the Bankruptcy Code provides:

---

[1] Only a "municipality" can file for relief under Chapter 9. The term "municipality" is defined in the Bankruptcy Code to mean "political subdivision or public agency or instrumentality of a State." 11 U.S.C. § 101(40). The definition is broad enough to include cities, counties, townships, school districts, and public improvement districts. It also includes revenue-producing bodies that provide services which are paid for by users rather than by general taxes, such as bridge authorities, highway authorities, and gas authorities. A municipality may only be a debtor under Chapter 9 if it "is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2).

7

> Notwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with —
>
> (1) any of the political or governmental powers of the debtor;
>
> (2) any of the property or revenues of the debtor; or
>
> (3) the debtor's use or enjoyment of any income-producing property.

11 U.S.C. § 904 (2000).  See also Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 509 (1942) ("A city['s creditors] cannot . . . take over the taxing power."). This is consistent with the principle of judicial noninterference in the operation of sovereign functions.

Having examined what federal courts generally refrain from doing, it is appropriate to look at the CNMI statutory provisions on how judgment creditors of the Commonwealth actually do get paid.

For all actions against the Commonwealth government, constituting "[a]ny other civil action or claim against the Commonwealth government,"[2] 7 CMC § 2251(b), including "any express or implied contract with the Commonwealth government, or for liquidated or unliquidated damages in cases not sounding in tort," Id., judgments are subject to payment as follows:

> **§ 2254.   Payment of Judgments.**
>
> Judgments rendered pursuant to this article shall be paid from such funds as may be appropriated by the Commonwealth Legislature for that purpose.

7 CMC § 2254.  A few such appropriations and payments have been made by the legislature in recent years.  See, e.g., Pub. L. 15-28, Appropriations and Budget

---

[2] Non-constitutional tort claims are covered by Title Seven of the Commonwealth Code, Section 2205, which provides: "Payment of Judgments.  Money judgments rendered against the Commonwealth shall only be paid from funds specifically appropriated for that purpose by the legislature."  7 CMC § 2205.

1  Authority Act for 2007, § 503 (p. 6, $453,330 for judgments against the government)
2  (N. Mar. I. Sep. 15, 2006) (***Exhibit 2***).  Subsection 503(a) appropriated funds to pay
3  a judgment of this very Court, and subsection 503(b) appropriated funds for the plaintiffs
4  in <u>Sylvan Atalig v. Rota Municipal Council</u>, Civ. No. 04-0012 (N.M.I. Super. Ct.), who
5  were ***represented by the same counsel as Plaintiff's counsel in the present case***.
6       Just three months ago the Saipan & Northern Islands Legislative Delegation passed
7  a law appropriating land compensation for a man in grave medical need for the funds.  <u>See</u>
8  Saipan Local L. 16-1, Re-appropriating $252,000.00 toward judgment (N. Mar. I. May 16,
9  2008) (***Exhibit 7***); Saipan Local L. 16-2, Re-appropriating $90,200.00 toward judgment
10 (N. Mar. I. May 16, 2008) (***Exhibit 8***).  These local laws involved the judgment
11 in <u>Jose Ch. Camacho v. CNMI DPL & MPLA</u>, Civ. No. 04-0220 (N.M.I. Super. Ct.).
12      Additionally, the Legislature has other bills pending to address claims and
13 judgments against the CNMI.  <u>See</u> House Bill 16-23, $2,158,129.51 for payment of health
14 care claims (N. Mar. I. pre-filed Feb. 11, 2008) (***Exhibit 4***); House Bill 16-52, land
15 compensation offsets against CDA loans (N. Mar. I. pre-filed Feb. 29, 2008) (***Exhibit 5***);
16 House Bill 16-61, $20,000,000 land compensation bond (N. Mar. I. pre-filed Mar. 12,
17 2008) (***Exhibit 6***); House Bill 16-106, $1,877.19 for Small Claims case & $10,213.00 for
18 Wm. S. Reyes Elem. Sch. (N. Mar. I. pre-filed May 22, 2008)  (***Exhibit 9***).  With respect
19 to the proposed land compensation bond, <u>see</u> Ferdie de la Torre, "List of landowners
20 awaiting compensation sought," <u>Saipan Tribune</u>, Thur. Aug. 14, 2008, <u>reprinted at</u>
21 http://www.saipantribune.com/newsstory.aspx?cat=1&newsID=82513  (***Exhibit 10***).
22      In response to this legislative action and the CNMI's "dire financial condition,"
23 which Plaintiff candidly acknowledges, <u>see</u> Memorandum in Support of Motion at 2,
24 line 6, what has been Plaintiff's response?
25

9

> In October, 2007, my client returned to Saipan to personally lobby the Legislature to appropriate funds to pay the Judgment. My client advised he was repeatedly promised that the money would be appropriated. I attended one meeting with legislators and I heard their promises that they would appropriate the money. Despite repeated promises, no legislation was ever passed to pay the Judgment in this matter. My client finally gave up on the Legislature and returned to his home in Seattle in April, 2008.

Declaration of Counsel in Support of Motion, ¶ 6 (D.N.M.I. July 24, 2006). Plaintiff's counsel attended one meeting, and his client attempted to lobby the legislature less than a month before an election; during its lame duck phase when a 3/4 super-majority is required for appropriations, N.M.I. Const. art. III, § 7(d); and during the busy organization of a new legislature.

Given counsel's success and efforts on behalf of other clients — including Marine Revitalization Corporation, where the creditor of over $5 million is seeking a mandatory tax credit in the courts of the Commonwealth — it is clear that a more persuasive case must be made with respect to the needs of this particular Plaintiff with respect to all the competing demands on the public fisc.

While Plaintiff's counsel opines, "Unless this Court issues a writ or otherwise orders that the Defendants pay the Judgment, my belief is that the Defendants will never honor this Court's Judgment," Declaration of Counsel in Support of Motion, ¶ 12 (D.N.M.I. July 24, 2006), there is a reason judgments are enforceable for twenty years. 7 CMC § 2502(a)(1). Plaintiff is seeking a shortcut that would substitute the skill or creativity of counsel for the democratic procedures guaranteed to all citizens of this country.

In his motion, Plaintiff has cited absolutely no authority for seizing the assets of a state or territory, or deposing or interrogating its financial officers. Attaching physical assets at fire sale prices would liquidate public assets at pennies on the replacement cost dollar, precisely the sort of resource allocation the legislature is called upon to undertake

in its appropriation process. As referenced above, in at least one other case, Plaintiffs' counsel have sought to execute a judgment in the form of a tax credit.[3]

The consequences of willy-nilly attachment of financial accounts could be calamitous, including denial of life-saving medical care or police protection, or an even worse electrical supply situation. Such decisions must be made in a measured way by the elected legislature seeking the good of all, not by an attorney duty-bound to put his client first, or even a court that must rule in a particular case or controversy and not act as a super-legislature balancing which claimants have priority over increasingly scarce resources.

### III. The Department of Public Lands serves in a fiduciary capacity.

The Department of Public Lands (DPL) stands in a different capacity from the CNMI and DPW. By law, it is a fiduciary. The funds of the former MPLA and DPL do not belong to the CNMI government, but are reserved and held in trust for the indigenous people of Northern Marianas Descent. N.M.I. Const. art. XI, §§ 1, 5(g); N.M.I. Pub. L. 15-2, § 2(b) ("administered in compliance with the requirements and fiduciary duties imposed by the Constitution") (***Exhibit 1***). See also Jose Ch. Camacho v.

---

[3] While the issue is controversial, federal courts do have the authority to order municipal officials to raise taxes in certain circumstances. Missouri v. Jenkins, 495 U.S. 33, 55-57 (1990). However, taxation is a fundamental governmental power. See Missouri v. Jenkins, 515 U.S. 70, 133 (1995) (Thomas, J., concurring) (describing taxation power as inherently "legislative or executive," not "judicial"); Jenkins, 495 U.S. at 51 ("In assuming for itself the fundamental and delicate power of taxation the District Court not only intruded on local authority but circumvented it altogether."); Id. at 67 (Kennedy, J., concurring) ("A judicial taxation order is but an attempt to exercise a power that always has been thought legislative in nature."); see also Pittman v. Chicago Bd. of Educ., 64 F.3d 1098, 1102-03 (7th Cir. 1995) (relying on power of taxation as distinguishing feature as to whether "one person, one vote" need apply in municipal elections), cert. denied, 517 U.S. 1243 (1996).

CNMI DPL & MPLA, Civ. No. 04-0220, Declaration of John S. Del Rosario, Jr. (N.M.I. Super. Ct. Dec. 19, 2006) (*Exhibit 3*).

During the course of trial, the Court heard testimony to the effect that MPLA was acting solely as agent for CNMI and DPW because of its institutional expertise in land valuation matters. Testimony of Appraiser Mitchell Aaron. See also Declaration of John S. Del Rosario, Jr., ¶ 10 (*Exhibit 3*). But see N.M.I. Pub. L. 15-2, § 3, "Section 105(f)(6)" (comprehensive land use plan to include component to [i]dentify lands that should be made available for exchange in order to improve the manageability and value of the public land holdings and other public purposes such as the acquisition of rights of way"). Yet such latter statutory land exchange is not open-ended, but applies with respect to management of public land, and always subject to the command of the Constitution. Otherwise, raiding the coffers of DPL for the benefit of the entire CNMI's public highways would be a seizure of assets of a limited group for the benefit of the entire Commonwealth, in clear violation of the due process rights of the indigenous people of the Northern Mariana Islands.

With respect to the former Marianas Public Lands Authority, a different payment-of-judgments statute applies, assuming the CNMI Constitution permitted MPLA assets to be seized for judgments against the CNMI and DPW. Title Seven of the Commonwealth Code, Section 2212 addresses the effect of Section 2254 on boards and public corporations with independent, non-legislative funding.

### § 2212.   Payment of Certain Judgments.

> The provisions of 7 CMC §§ 2205 and 2254 apply to judgments rendered against public corporations, boards, and commissions, except those public corporations, boards, and commissions:

12

      (a) Which do not receive funds appropriated by the legislature for operations; and

      (b) Whose enabling legislation contains provisions authorizing them to pay money judgments rendered against them only out of funds allocated by them for that purpose.

7 CMC § 2212.  No legislation was enacted allowing MPLA to pay money judgments rendered against them, so the general requirement in Section 2254 for legislation likewise applies to the former MPLA.

## Conclusion

The ultimate error in Plaintiff's Motion for a Writ of Execution or an Order in Aid of Judgment is that it treats the CNMI as any other private litigant.  It is not. See Richards, 4 F.3d at 755 (balancing test).  However flawed and bereft of resources, the Commonwealth government is the embodiment of the aspirations of its people and the principles of the United States and CNMI Constitutions.

Those  aspirations and principles must be respected.

Respectfully submitted,

      OFFICE OF THE ATTORNEY GENERAL

      MATTHEW T. GREGORY  # F0205
      Attorney General

Dated:  Tuesday, 26 August 2008.

      *Gregory Baka*
      GREGORY BAKA  # F0199
      Deputy Attorney General

      Attorneys for Defendants CNMI, former MPLA (DPL), and DPW

**Exhibits**

| | |
|---|---|
| Pub. L. 15-2, Public Lands Act of 2006, § 101 (N. Mar. I. Feb. 22, 2006) | Exh. 1 |
| Pub. L. 15-28, Appropriations and Budget Authority Act for 2007, § 503 (p. 6, $453,330 for judgments against the government) (N. Mar. I. Sep. 15, 2006) | Exh. 2 |
| Jose Ch. Camacho v. CNMI DPL & MPLA, Civ. No. 04-0220, Declaration of John S. Del Rosario, Jr. (N.M.I. Super. Ct. Dec. 19, 2006) | Exh. 3 |
| House Bill 16-23, $2,158,129.51 for payment of health care claims (N. Mar. I. pre-filed Feb. 11, 2008) | Exh. 4 |
| House Bill 16-52, land compensation offsets against CDA loans (N. Mar. I. pre-filed Feb. 29, 2008) | Exh. 5 |
| House Bill 16-61, $20,000,000 land compensation bond (N. Mar. I. pre-filed Mar. 12, 2008) | Exh. 6 |
| Saipan Local L. 16-1, Re-appropriating $252,000.00 toward judgment (N. Mar. I. May 16, 2008) | Exh. 7 |
| Saipan Local L. 16-2, Re-appropriating $90,200.00 toward judgment (N. Mar. I. May 16, 2008) | Exh. 8 |
| House Bill 16-106, $1,877.19 for Small Claims case & $10,213.00 for WSR Elem. Sch. (N. Mar. I. pre-filed May 22, 2008) | Exh. 9 |
| Ferdie de la Torre, "List of landowners awaiting compensation sought," Saipan Tribune, Thur. Aug. 14, 2008, reprinted at http://www.saipantribune.com/newsstory.aspx?cat=1&newsID=82513 | Exh. 10 |

n:\ . . . \gbaka\civil\land compensation\A.Camacho v. CNMI\opp.to.mo.for.writ.of.execution.(DNMI.26Aug08).pld.wpd

# CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(d), the undersigned declarant states as follows:

1. I am eighteen years of age or older, and I certify that I caused to be served the following document(s) to the last known address(es) listed below on the date(s) indicated.

**OPPOSITION TO MOTION FOR WRIT OF EXECUTION OR ORDER IN AID OF JUDGMENT; CERTIFICATE OF SERVICE**

2. As set forth below, this service was accomplished either by personal delivery; U.S. Mail; deposit with the Clerk of Court (in attorney's box), cf. Fed. R. Civ. P. 5(b)(2)(D); or electronic service, see Local Rule 5.1.

| | |
|---|---|
| Michael W. Dotts, Esq.  # F0150<br>George L. Hasselback, Esq. #F0325<br>O'Connor, Berman, Dotts & Banes<br>Marianas Business Plaza, 2nd Floor<br>Nauru Loop, Susupe<br>P. O. Box 501969<br>Saipan, MP  96950-1969 | Attorneys for Plaintiff<br>Tel:  (670) 234-5684<br>Fax:  (670) 234-5683<br>E-mail:  attorneys@saipan.com<br>**Via Electronic Service** |

3. I declare under penalty of perjury that the foregoing is true and correct. Executed on Tuesday, 26 August 2008.

_Gregory Baka_
GREGORY BAKA  # F0199
Deputy Attorney General
Attorney for Defendants CNMI,
    former MPLA (DPL), and DPW