1  MICHAEL W. DOTTS, ESQ.
2  O'Connor Berman Dotts & Banes
   Second Floor, Marianas Business Plaza
3  P.O. Box 501969
   Saipan, MP 96950
4  Telephone No. (670) 234-5684
   Facsimile No. (670) 234-5683
5
6  *Attorneys for Plaintiff Antonio S. Camacho*

7
           IN THE UNITED STATES DISTRICT COURT
8            FOR THE NORTHERN MARIANA ISLANDS

9  ANTONIO S. CAMACHO                    )   CIVIL CASE NO. 05-0043
                                         )
10            Plaintiff,                  )
                                         )
11      vs.                              )
                                         )
12                                       )
    COMMONWEALTH OF THE                  )   REPLY TO OPPOSITION TO
13  NORTHERN MARIANA ISLANDS,            )   MOTION FOR A WRIT OF
    DEPARTMENT OF PUBLIC LANDS,          )   EXECUTION OR FOR AN ORDER
14  successor to the Marianas Public Lands )  IN AID OF JUDGMENT
    Authority, and DEPARTMENT OF         )
15  PUBLIC WORKS,                        )
                                         )
16            Defendants.                )   No Hearing Requested
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

Table of Authorities ...............................................................................i - ii

I. INTRODUCTION.............................................................................1

II. ARGUMENT..................................................................................2

    A. Jurisprudence Supports Enforcement of the Judgment...................2

        1. The Continued Refusal to Honor the Judgment Violates
           Separation of Powers............................................................2

        2. Like Any Party to a Contract, the Commonwealth is
           Obligated to Pay its Obligation...........................................5

        3. This Court Could Order the Garnishment of Federal
           Funds to Satisfy the Judgment............................................7

        4. Other Analogous Situations Support Enforcement of
           the Judgment Here...............................................................9

    B. The *U.S. ex rel. Richards* Balancing Test Supports Enforcement
       Of the Judgment..................................................................12

    C. DPL Has No Special Standing to Escape from the Payment
       On a Judgment Lawfully Entered Against It and DPW Has
       Already Been Appropriated Funds that Can Be Taped to
       Satisfy the Judgment...........................................................15

III. CONCLUSION ..........................................................................18

## Table of Authorities

*AFSCME/Iowa Council v. State*, 484 N.W.2d 390 (Iowa 1992)...................5, 6

*Atalig v. Rota Municpal Council*, Civ. No. 04-0012 (N.M.I. Super. Ct.)...........17

*Carmel Valley Fire Protection Dist. V. State of California,*
190 Cal. App. 3d 521 (1987)..............................................................16

*Colorado General Assembly v. Lamm*, 700 P.2d 508 (Colo. 1985)...................8

*Colorado General Assembly v. Lamm*, 738 P.2d 1156(Colo. 1987). ...........…......8

*Duran v. Lamm*, 701 P.2d 609 (Colo. Ct. App. 1984)..............................…...10

*Gary W. v. State of Louisiana*, 622 F.2d 804 (5th Cir. 1980)..........................9

*Gates v. Collier*, 616 F.2d 1268 (5th Cir. 1980)......................................…...9

George D. Brown, *Federal Funds and National Supremacy:*
*The Role of State Legislatures in Federal Grant Programs,*
28 AM. U. L. REV. 279 (1979)...............................................................…......7

*Heidenreich v. Second Judicial District Court*, 352 P.2d 249 (Nev. 1960)........11

*Hutto v. Finney*, 437 U.S. 678 (1978)...........….............................…......9

*Jose Ch. Camacho v. CNMI DPL & MPLA*, Civ. No. 04-0220
(N.M.I. Super. Ct. 2008)..............................…..................................…..12

*Bedford v. People ex rel. Tiemann,*
98 P.2d 474 (1939)..........................................................................…..6

*Mac Manus v. Love*, 499 P.2d 609 (Colo. 1972)......................................…..8

*Mandel v. Myers*, 29 Cal. 3d at 531,  629 P.2d at 935 (Calif. 1981)...............4-5

*Santos v. Calvo*, 1982 WL 30790 . (D. Guam A.D. Aug. 11, 1992)…....…........ 8

*Spain v. Mountanos*, 690 F.2d 742 (9th Cir. 1982)......................................10

*State ex rel. Brubaker v. Pritchard*, 138 N.E.2d 233 (Ind. 1956). ........... ….....3

*State ex rel. Decker v. Yelle*, 71 P.2d 379 (Wash. 1937)................................11

*State ex. rel. Peel v. Clausen*, 162 P. 1 (Wash. 1917). ................................11

*Stong v. Industrial Commission*, 204 P. 892 (1922)..................................6

*The Role of State Legislatures in Federal Grant Programs*,
28 AM. U. L. REV. 279 (1979)...............................................................7

*U.S. ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749 (9th Cir. 1993)...........14

# I.

## INTRODUCTION

Antonio Camacho obtained a judgment after a jury trial in the amount of $239,397.00. The Defendants appealed to the Ninth Circuit (as was their right) and that appeal was dismissed. The judgment became final on December 8, 2006. As of September 11, 2008, the Defendants have not paid a single penny toward satisfaction of that final judgment (the "Judgment"). Despite what Defendants' argue, they have *no right* to ignore the Judgment for now, and pay it if and when they are ready.

Defendants in their Opposition to Motion for Writ of Execution on Order in Aid of Judgment, filed August 26, 2008 ("Defendant's Opposition") take an unduly narrow view with respect to what relief this Court is empowered to order. If this Court cannot enforce its judgments as Defendants' argue, then the Separation of Powers embodied in the United States Constitution is violated. The Legislature will, in effect, have the ability to exercise a veto over monetary judgments entered against the government by the courts. Defendants' anarchistic position, however, is not supported by the case law.

There is little case law on the subject of the execution of judgments against governmental entities. Most likely this is because most governments pay their judgments. However, what case law there is, supports the ability of courts to enforce their judgments against recalcitrant states. Based on Separation of Powers and for other reasons, the Judgment in issue here can be enforced through a writ of execution or by compelling Commonwealth officials to pay the Judgment out of agency operating funds.

Defendants argue in their Opposition that this Court must follow the mandate of *U.S. ex rel. Richards v. Guerrero* and balance the interests between the federal enforcement of a judgment and the Commonwealth's right to self government.   This may be true, but the Defendants do not bother to explain how balancing these interest favor the interest of the Commonwealth in spending its money on fishing derbies and flame tree festivals over paying Camacho for land taken from him in 1993.  Balancing the competing interests here clearly favors this Court enforcing the Judgment in issue.

Finally, Defendants argue that the Department of Public Lands ("DPL") has a separate status from the other Defendants as a "fiduciary", and therefore a judgment entered against DPL cannot be enforced.  This not only is an argument that should have been raised before trial and was not, it is also completely wrong.  DPL can sue and be sued.  *See* PL 15- 2 §101 carrying over MPLA's ability to "sue and be sued" under CMC §2802(c).  Judgments against it are therefore enforceable.  Plaintiff should be allowed to execute on DPL's bank accounts to satisfy his Judgment.  Further, also named as a defendant is the Department of Public Works ("DPW") and this Court has the ability to attach money that has already been appropriated to DPW for operations.  Finally, the Commonwealth itself is a party and can be compelled to pay the Judgment.  Consequently, the Judgment in issue here can and should be enforced.

## II.

## ARGUMENT

### A. Jurisprudence Supports Enforcement of the Judgment

#### 1. The Continued Refusal to Honor the Judgment Violates Separation of Powers

While the legislature does enjoy the privilege of determining how governmental funds

are spent, by refusing to obey an order of the judicial branch, the legislature is unconstitutionally violating the separation of powers doctrine.  As the Supreme Court of Indiana remarked:

> To deny a court the power to enforce obedience to its lawful orders against parties who have been subjected properly to its jurisdiction in the first instance, is to nullify its effectiveness as in [sic] independent branch of our government. The power of a court to enforce compliance with its orders and decrees duly entered is inherent . . . Although the legislature may within limits regulate procedural features in some respects, it may not under such guise impair the inherent power of the court in performing its judicial functions, and enforcing its orders and decrees where it has originally and properly acquired jurisdiction of parties. Such powers are essential to an independent judiciary and the efficacy of its orders and decrees. Such powers spring from the Constitution, not from the legislature.

*State ex rel. Brubaker v. Pritchard*, 138 N.E.2d 233, 235-36 (Ind. 1956).

The Supreme Court of California examined the question of whether or not a legislature's refusal to give effect to a judicial judgment violated the separation of powers doctrine under the California Constitution.  In *Mandel v. Myers,* that court decided:

> …that while the separation of powers doctrine may restrict a court from directly ordering the Legislature to enact an appropriation law, the doctrine does not preclude the judiciary from decreeing that funds that have been appropriated by the Legislature should be paid without regard to an improper or invalid legislative restriction. If, in the absence of such invalid restriction, appropriated funds are reasonably available for the expenditures in question, the separation of powers doctrine poses no barrier to a judicial order directing the payment of such funds.

629 P.2d 935, 941 (Cal. 1981).

In *Mandel v. Myers*, the California Legislature had failed, within a reasonable amount of time, to appropriate monies to pay a judgment for attorneys fees to the prevailing party in a lawsuit against a state agency. *Id* at 937.  Furthermore, that legislature had specifically cut out such appropriations from proposed appropriation bills.  Faced with this purposeful refusal to

3

give effect to a judgment, the plaintiff had sought an order from a lower court compelling the State Controller (the state official in charge of the disbursement of funds appropriated to various state agencies), to pay the judgment out of "operations expenses" of the particular agency against whom the judgment was rendered. *Id.*

The defendant agency in *Mandel v. Myers* appealed. The California Supreme Court held that:

> ...the trial court order at issue here does not compel the Legislature to appropriate funds. Instead, the order simply directs the State Controller to pay the sum in question out of funds that have already been appropriated. Accordingly, in determining the propriety of this order, we turn to the question of whether the trial court could properly conclude that the appropriated funds at which the order is directed were reasonably available for payment of the attorney fees in question.

*Id* at 941.

Here, DPL or DPW, or the Commonwealth as a whole, can be compelled to pay the Judgment. Following *Mandel v. Myers* it would be appropriate for this Court to order the Secretaries of DPL and DPW to pay Camacho, or the Secretary of Finance to pay him. This would not violate the Commonwealth's sovereignty. [1]

The California Supreme Court, in bank, explained:

> In sum, individual citizens who litigate claims against the government in our state courts are constitutionally entitled to expect that when the government loses, the Legislature will respect the final outcome of such litigation. The Legislature is not a super-court that can pick and chooses on a case-by-case basis which final

---

[1]  The Appropriations and Budget Authority Act of 2007 already appropriated operating budgets for two of the defendant-agencies in this case. Specifically, it appropriated $1,189,591.00 for "Operations" of the Department of Public Lands. PL 15-28, § 605. Also, it specifically appropriated $637,826.00 to the Department of Public Works for "Operations." PL 15-28, Summary of Appropriations. Therefore, this Court would not offend the province of the Legislative to appropriate if it tapped these, already appropriated, but unspent, "operations" funds for payment of Plaintiff's Judgment.

1    judgments it will pay and which it will reject. If that kind of arbitrary conduct by
2    the Legislature were to be the law, our system of justice would be subordinated to
     the popular vote of legislators, and our constitutional bed-rock principle of
3    separation of powers would become a shattered mass of scattered fragments.

4    *Mandel v. Myers, supra.*, 29 Cal. 3d at 552, 629 P.2d at 948.

5

6        Camacho was forced to litigate with the Commonwealth because they took his land and

7    would not pay. Camacho won and the Commonwealth still will not pay. As a matter of the bed-

8    rock principal of separation of powers, this Court must enforce its Judgment and compel the

9    Commonwealth to pay. The Writ of Execution or an Order in Aid of Judgment should issue.

10

11        **2. Like Any Party to a Contract, the Commonwealth is Obliged to Pay its**
           **Obligations**
12

13        A state cannot hide behind its constitution to avoid paying an obligation when it has

14   bound itself by contract. In *AFSCME/Iowa Council v. State*, 484 N.W.2d 390 (Iowa 1992),

15   unions representing public employees brought an action to enforce an arbitration award granting

16   wage increases it received as part of an agreement to be bound by the arbitration it had made

17   with the State of Iowa. The State refused to honor the award. The court noted that the "State

18   contends that a contract with it is not really contract, or, if it is labeled a contract, the State need

19   not perform." *Id.* at 391. The court held that, notwithstanding the State of Iowa's appropriation

20   process, it would nevertheless agree with the Unions that the State must honor its agreement.

21   The court stated:

22

23        Whatever strengths could be perceived in the State's position simply cannot be
          used to frustrate its contractual obligations. In the first place the foregoing
24        provisions do not exist in vacuums. The unions point out that contractual rights
          also enjoy strong validation in both the federal and our own Constitution.
25        "Freedom of contract is a basic right, protected under the liberty concept of both
          the Fifth and Fourteenth Amendment due process clauses." 1 Antieau, *Modern*
26        *Constitutional Law* § 3:22, at 244 (1969) (citing *Prudential Ins. Co. v. Cheek*,
          259 U.S. 530, 536 (1922)). Indeed the enforceability of contracts, even with
27

28
                                                      5

respect to the obligations of government, has been established from the earliest days of our republic. In *Perry v. United States,* 294 U.S. 330, 353 n. 3 (1935), the United States Supreme Court quoted with approval the following eighteenth century authority:

> [W]hen a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be justly considered as excepted out of its power to legislate unless in aid of them. It is in theory impossible to reconcile the idea of a promise which obliges, with a power to make a law which can vary the effect of it. *Id.* (quoting Hamilton: *Communication to the Senate,* January 20, 1795). If we possessed the power to fashion a different rule for Iowa law, a power we very much doubt we have, we would not do so. It would be no favor to the State to exonerate it from contractual liability. To do so would seriously impair its ability to function. A government must finance its affairs, must contract for buildings, highways, and a myriad of other public improvements and services. It would lead to untenable results if a government, after having contracted for needed things, did not have to pay for them. The rules of economics seem to exact a terrible price from those of uncertain responsibility. The few persons or institutions willing to deal with an exempt state would necessarily factor in the cost of such a tentative chance to collect. This cost to the State would ultimately be borne by the public.  Authorities from other jurisdictions indicate that these principles apply to enforce wage agreements for public employees. *See generally Association of Surrogates v. State of New York,* 940 F.2d 766, 771 (2d Cir.1991); *Association of Surrogates v. State of New York,* 79 N.Y.2d 39, 44-45, 588 N.E.2d 51, 53, 580 N.Y.S.2d 153, 155 (1992); *Carlstrom v. State,* 103 Wash.2d 391, 394-96, 694 P.2d 1, 4 (1985).

*AFSCME/ Iowa Council v. State*, 484 N.W.2d at 394.


The *AFSCME/Iowa Council* court stopped short of explaining exactly what would happen if the State still refused to honor its obligations after the court's ruling.  Instead the court simply said:

> The considerations, including political considerations that go into the appropriation process, are left to the legislative branch, with the executive participation we have mentioned. The judicial branch will intercede, under its constitutional authority, in that process only when a failure to act, or a deadlock, has left an *adjudicated* state obligation uncollectible. We trust, owing to the goodwill and respect for the rule of law on the part of the governor and the legislators, such a point will not be reached in this dispute.

6

*Id.*, 484 N.W.2d at 396.


The instant case is similar to a contract case. The Commonwealth took Camacho's land in 1993 and owed him just compensation as of that date. The Commonwealth did not pay and like requiring a sovereign to honor its contractual obligations, the Commonwealth can be compelled to pay the just compensation to Camacho that it has owed for so many years. The Judgment should be enforced.


### 3. This Court Could Order the Garnishment of Federal Funds to Satisfy the Judgment


A state legislature's plenary authority to control its funds does not extend to federally disbursed funds. This is because, since a legislature (the U.S. Congress) has already "appropriated" the funds to the state, the state's legislature cannot limit an executive branch's administration of federal funds. *See generally* George D. Brown, *Federal Funds and National Supremacy: The Role of State Legislatures in Federal Grant Programs*, 28 AM. U. L. REV. 279 (1979).


In *Mac Manus v. Love*, 499 P.2d 609 (Colo. 1972), the Colorado Supreme Court held that a portion of a bill providing that any federal or cash funds received by an agency in excess of the appropriation shall not be expended without additional legislative appropriation violated the constitutional doctrine of separation of powers by attempting to limit the executive branch in its administration of federal funds unconnected with any state appropriations. In other words, the power of a legislature to make appropriations relates to state funds, and custodial federal funds

7

are not state moneys. *Mac Manus* at 610 citing *Bedford v. People ex rel. Tiemann*, 98 P.2d 474

(1939) *& Stong v. Industrial Commission*, 204 P. 892 (1922). Applying this reasoning to the

present case, federally disbursed funds are not subject to the Commonwealth Code provisions

limiting the Commonwealth Court's Orders in Aid of Judgment, specifically. This Court can,

and should, order the appropriate executive official to pay the judgment from available federal

funds. *See Santos v. Calvo*, 1982 WL 30790 *6 (D. Guam A.D. Aug. 11, 1992) ("The only

reasonable alternative is . . . to conclude that the Governor is authorized to exercise his executive

prerogative in administering the expenditure of appropriated funds").


These available funds would necessarily be limited to custodial funds (aka categorical

grants). *Mac Manus* at 610. The language used to define "custodial moneys" essentially relies

on various factors providing four basic elements which, together, constitute "custodial moneys":

(1) the funds originate from outside of the State; (2) the funds are provided for a particular

purpose or program; (3) the funds contain restrictions or defined standards for their use or

otherwise require approval for their use from a non-state entity; and (4) the funds are to be held

by the state in a custodial capacity in order for the state to carry out the funds' designated

purpose. *In re Interrogatories Submitted by General Assembly on House Bill 04-1098*, 88 P.3d

1196, 1205 (Colo. 2004); *see also Colorado General Assembly v. Lamm*, 700 P.2d 508 (Colo.

1985). If the funds are not custodial funds, then they may be deemed federal "block grants", and

the state legislature will have plenary control over the funds. *See Colorado General Assembly v.*

*Lamm*, 738 P.2d 1156, 1174 (Colo. 1987).


Here, the alternative to executing on Commonwealth funds is to allow Camacho to

execute on federal funds that the Commonwealth receives.   Doing so will not violate the sovereignty to the Commonwealth to appropriate its own funds and will result in satisfaction of the Judgment.   If the Court is hesitant to allow Camacho to execute on Commonwealth funds, Camacho should be allowed to execute of federal funds received by the Commonwealth.

### 4. Other Analogous Situations Support Enforcement of the Judgment Here

There have been a few situations where a court has ordered a state to comply with an order. The first of these situations involve awards of attorney's fees in Civil Rights Act cases rendered by a Federal District Court against a State. In *Gates v. Collier*, 616 F.2d 1268 (5th Cir. 1980), a group of inmates in a Mississippi penitentiary brought a civil rights action challenging the conditions in the prison. After finding for the inmates, the Federal District Court awarded them attorney's fees pursuant to 42 U.S.C. § 1988. *Id.* Mississippi argued that they could not be ordered to pay since Miss. Code Ann. § 11-45-5 (1972) prohibited the satisfaction of any judgment against the State '"except by an appropriation therefore by the legislature." *Id.* at 1271.  Relying on *Hutto v. Finney*, 437 U.S. 678, 693-94 (1978), the 5th Circuit held that "it is now beyond dispute that a federal district court has the authority to order that attorney's fees be paid out of a state's treasury." *Gates* at 1271.

Later, in *Gary W. v. State of Louisiana*, 622 F.2d 804 (5th Cir. 1980), a group of class action litigants suffering from mental and emotional problems won a lawsuit against the State of Louisiana's Department of Health and Human Resources ("DHHR") ensuring them adequate care and treatment.  In addition to this injunctive relief, the litigants were entitled to attorney's

fees under 42 U.S.C. § 1988. *Id.* at 805. The State of Louisiana refused to pay the litigants these fees. *Id.* As a result, a Federal District Court ordered a writ of execution directing the U.S. Marshal to seize property of the DHHR to satisfy the judgment. *Id.* The State of Louisiana brought a motion to quash the writ on the grounds that Louisiana law prohibited the seizure of public property. *Id.* After a hearing the Federal District Court ordered the director of the DHHR to satisfy the judgment out of DHHR funds. *Id.* Louisiana appealed this order arguing that a federal court lacked the power to compel compliance with a judgment unless state law provides a means of enforcing such judgments. *Id.* The Court disagreed. Relying on *Gates*, the 5th Circuit affirmed the District Courts order and stated ". . . an order directing the responsible official to satisfy the judgment out of state funds is the only reasonable way to ensure compliance with a valid federal judgment." *Id.* at 806-07.

In *Spain v. Mountanos*, 690 F.2d 742 (9th Cir. 1982), a group of Plaintiff inmates again won a case against a State ensuring them adequate care and treatment and awarding them attorney's fees. When faced with the prospect of affirming the lower Court's attempts to force the State to pay the Ninth Circuit stated:

> Ordinarily, the equitable remedies provided under Rule 70 are not appropriate in enforcing a monetary judgment.... However, under the extraordinary circumstances here where the judgment is against a state, which refuses to appropriate funds through the normal process provided by state law, the district court should not necessarily be reduced to satisfying a judgment through the cumbersome procedure of attempting to execute against state property or bank accounts. It may, instead, pursue any remedy provided in Rule 69 *or* Rule 70 to enforce the award, including ordering state officials to pay the claim.

690 F.2d at 744-45; *see also Duran v. Lamm*, 701 P.2d 609 (Colo. Ct. App. 1984) (discussing the rule in Gates and Spain).

10

Another line of cases involve state court orders to pay judgments obtained in eminent domain proceedings. In *Heidenreich v. Second Judicial District Court*, 352 P.2d 249 (Nev. 1960), the State of Nevada took land for the purposes of building a highway, but repeatedly neglected to actually reimburse the owner for the taking. While the Court noted that a writ of execution cannot issue against the State it also agreed with the Washington State Supreme Court that:

> We agree with that court's conclusion that, while respecting the reservation to the legislature of the exclusive power of deciding how, when, and for what purpose public funds should be used by governmental agencies in carrying on the state's business, it was never intended that such provision should be a bar to the protection of the citizens against the abuse or misuse of the power of eminent domain, an inherent attribute of the state's sovereignty, by appropriating the citizen's property and then remitting him to succeeding legislatures for compensation.

352 P.2d 252 *citing* to *State ex rel. Decker v. Yelle*, 71 P.2d 379, 380 (Wash. 1937); *see also State ex rel. Peel v. Clausen*, 162 P 1 (Wash. 1917).

What is consistent in all these cases is that judgments must be enforced. When a state is reluctant to pay its obligation, courts finds ways to enforce their judgments. Otherwise, the entire social system is threatened.

Here, Camacho has waited since 1993 to pay for land that the Commonwealth took from him. He has waited since December, 2006, for payment of his final Judgment. Since the Commonwealth won't pay, this Court must intercede to enforce its Judgment. A Writ of Execution should issue.

**B. The *U.S. ex rel. Richards* Balancing Test Supports Enforcement of the Judgment**

Here, Defendants briefly discuss *U.S. ex rel. Richards v. De Leon Guerrero*, 4 F.3d 749 (9th Cir. 1993). Correctly, Defendants point out that the Ninth Circuit held that:

> To give due consideration to the interests of the United States and the interests of the Commonwealth as reflected in Section 105, we think it appropriate to balance the federal interest to be served by the legislation at issue against the degree of intrusion into the internal affairs of the CNMI.

Defendants' Opposition at 5 quoting *U.S. ex rel. Richards* at 755.

Defendants then argue that while this case does not involve the application of a federal statute to the CNMI, *U.S. ex rel. Richards* would still apply, because:

> While *Richards* involved legislative power implemented by the executive branch, the same principles and rationale apply to the federal judiciary, including the Supreme Court's instruction that it (and accordingly, all other federal courts) may rely on the good faith of state governments or other public bodies to respond to its judgments.

Opposition at 6 (internal quotations and citations omitted).

Defendants wind this argument up with the astute observation that:

> Such deference by this Court need not be infinite and open-ended, but at the very least it must include a recognition of the interests implicated under the institutional right to self-government guaranteed by the Covenant Section 103 and, if such interests are to be outweighed by the interests of the federal judiciary, that they be subjected to the scale of *Richards* balancing.

Defendants' Opposition at 6.

Plaintiff agrees wholeheartedly that the *U.S. ex rel. Richards* balancing test should be applied here and the interests in this Court enforcing its judgments should be weighed against the Commonwealth's interests in measured and sensible payment of public funds. Plaintiff would

have loved to have heard Defendants' take on this balancing test and explain how it is more important that they fund fishing derbies and buy new playground equipment than pay the final judgment here.  *See* Public Law 16-11.[2]  Plaintiff would have enjoyed being educated how having his property taken from him in 1993 and never having to pay for it was an act of "self government" that outweighed the federal interest in protecting the property rights of its citizens. However, Defendants' did not bother to apply the *U.S. ex rel. Richards* this balancing test to the instant case.  Defendants identified the test, and then ran away from it.

In *U.S. ex rel. Richards,* the 9th Circuit recognized that:

---

[2]  At the last Chambers Conference the Assistant Attorney General assigned to this case stated that the Bill appropriating the money for these nice but unnecessary projects would most certainly be vetoed by the Governor in these difficult times.  It was not.  The Bill became law and the following was appropriated:

>        $45,000 -- 2009 Liberation Day Activities;
>        $50,000 -- CNMI Little League;
>        $25,000 --  Fishing Derby;
>        $20,000- Agricultural Fair;
>        $15,000 -- Flame Tree Festival;
>        $30,000 -- A&E for Benavente Baseball Field;
>        $100,000 -- Pavilion construction and children's playground equipment;
>        $10,000 -- Improvement at Pakpak Beach Park;
>        $15,000- Northern Islands field trip(?);
>        $5,600 --  to MCV for Chamorro Language programming;
>        $20,000 --  Construction of covered walkways at Oleai Elementary School;
>        $21,000 -- Northern Mariana Islands Museum of Culture and Arts;
>        $20,000 -- Tanita scales for the Public School System;
>        $25,000 -- Paving of parking area at Pakpak Beach Park; and
>        $5,000 -- Chief Aghurubw celebration.

There is no question that the United States has a substantial federal interest in monitoring the CNMI's collection of taxes. To date, the United States has provided the CNMI with over $420 million in direct assistance in accordance with Sections 701 and 702 of the Covenant. Moreover, to help the CNMI raise funds, the United States agreed not to collect any federal income tax on income earned by island residents in the Commonwealth. Instead, Section 601 enables the local government to collect what would otherwise be federal taxes as a local income tax. The United States therefore has a significant interest in ensuring that federal funds are being used properly and in determining the efficacy of the CNMI's revenue collection to assess future amounts of assistance.

*U. S. ex rel. Richards v. Guerrero, supra.*, at 755.

While the interest of the United States in this particular case, that of seeing the valid judgments of its courts given effective enforcement, is not the same as those implicated in *U. S. ex rel. Richards*, Plaintiff submits that it is just as important, if not more so that district court judgment be enforced, than the interest implicated in *U. S. ex rel. Richards*.

The United States' interest in this matter is nothing less than the ability of one of the three, Constitutionally-established branches of our government being able to do its job. What good is a judiciary if a judgment-debtor can never be compelled to pay the judgment? What good are the pronouncements of this Court…and all other federal courts…if they have no teeth? What good is our entire system of civil jurisprudence if a claimant may go through the entire trial procedure, prevail, and have nothing to show for it, because the judgment debtor refuses to pay? Put simply, no good at all.

Balanced against the federal interest of a district court being able to enforce its judgments is the Commonwealth's interest of being able to ignore judgments and spend is citizen's money how it wants. The Commonwealth wants to spend its people's money on fishing derby's, and

14

new playground equipment, a new baseball field, and a celebration of Chief Aghurubw, among other important projects. The Commonwealth does not want to pay Antonio Camacho for the land it took from him in 1993. Plaintiff submits that the interest the Commonwealth is trying to protect is the ability to act like a spoiled child. The Commonwealth interest is to spend money irresponsibly without having to pay lawful judgments entered against it. Consequently, balancing the interests under *U.S. ex rel. Richards* results in a total embarrassment for the Commonwealth. There is no good reason why this Court's Judgment should not be enforced.

The Commonwealth had its chance to decide how to pay the Judgment in issue here. Because the Commonwealth chose to ignore the Judgment and instead fund a field trip to the Northern Islands, to fund Liberation Day and Agricultural Fair activities, and buy Tanita Scales for the Public Schools to measure the students' body fat, it is now for this Court to enforce that Judgment. The Commonwealth had its chance to appropriate the money to pay the Judgment, but a new baseball field and Chamorro language TV programming won out. Now, a Writ of Execution must be issued.

**C. DPL Has No Special Standing to Escape from the Payment on a Judgment Lawfully Entered Against It and DPW Has Already Been Appropriated Funds that Can Be Taped to Satisfy the Judgment**

The Defendants argue in the last section of their Opposition that DPL cannot be forced to pay a judgment because, "[b]y law, it is a fiduciary". Defendant's Opposition at p. 11. However, DPL is the successor to MPLA and "all powers and duties assigned to [MPLA] by existing statute shall be assigned to the [DPL]. Public Law 15-2. One of those powers and duties that became part of DPL was that MPLA had "the powers available to corporations under

15

1  Commonwealth law". Commonwealth Const., Art. XI, Sec. 4.    In particular, MPLA as the

2  successor to the Board of Public Lands, had the right to "sue and be sued" in its own name."

3  Public Law 12-71. And once a judgment is entered:

4

5       All debts, liabilities, obligations and operation expenses of the Department shall
       be paid from DPL Operators Fund Bank account(s)

6  Public Law 15-2, Sec. 103 (c)(3).

7

8       Defendants' argument that DPL cannot be held to pay the Judgment is plainly wrong.

9  Defendants cite to 7 CMC § 2212 that exempts an agency from paying judgments "except

10  those...[w]hich do not receive funds appropriated by the legislature for operators".    DPL

11  received its operating funds from the lease rental of public lands. DPL is not exempted from the

12  payment of judgments.

13

14

15       DPL can be held jointly and severally liable for the full amount of the judgment entered

16  here. A writ of execution on DPL's operational funds account should issue.

17

18       Further, DPL is also a party here. DPW has been appropriated funds for operators by the

19  Legislature and those funds are subjected to execution. *See Carmel Valley Fire Protection Dist.*

20  *v. State of California,* 190 Cal. App. 3d 521, 539 (1987) ("once an adjudication has finally

21  determined the rights of the parties, the court may compel satisfaction of the judgment from a

22

23  current unexpanded, unencumbered appropriation which administrative agencies routinely have

24  used for the purpose in question").    The Judgment in issue here can be satisfied out of the

25  appropriation made to DPW for operations. A Writ of Execution should issue.

26       In an effort to demonstrate that the Commonwealth is serious about paying its judgments,

27

28                                      16

the Defendants present this Court with a recitation of several recent Legislative appropriations of funds to pay judgments.   Defendants' Opposition at 8-9.   First, Defendants cite to the appropriation $305,000 for the satisfaction of a judgment entered in *Atalig v. Rota Municpal Council*, Civ. No. 04-0012 (N.M.I. Super. Ct.).   Defendants highlight this case because Plaintiff's attorneys represented the plaintiffs in that action.   Defendants' Opposition at 8-9.   Defendants have forgotten that the original judgment in *Atalig v. Rota Municipal Council* was for $390,076.41 and that in an effort to get paid, the plaintiffs there *compromised* their judgment and appeal.   Further, the case was settled on appeal on about January 22, 2007 and the plaintiffs were not fully paid until March 27, 2008.   *See Declaration of Michael W. Dotts*, filed herewith.

Next, Defendants proudly state that the Saipan & Northern Islands Legislative Delegation "passed a law appropriating land compensation for a man in grave medical need for the funds." Defendants' Opposition at 9.   Are Defendants suggesting that Mr. Camacho's judgment will only be considered if he finds himself in "grave medical need?"   Defendants also do not mention that amount of the judgment owed to dying Mr. Camacho was $800,000 and the Legislature appropriated him a fraction of that amount. *See Dotts Declaration*.

The Commonwealth itself is a party here and if the Commonwealth is concerned that executing on the accounts of DPL or DPW will be harm those agencies, all the Commonwealth needs to do is arrange payment from another source.   The one thing that the Commonwealth cannot do is do nothing.   And since 1993 that is all the Commonwealth has done when it comes to paying what is owed to Antonio Camacho.   One way or the other the Commonwealth must pay its Judgment.   A Writ of Execution or an Order in Aid of Judgment should issue enforcing

17

this Court's Judgment.

## III.
## Conclusion

For all the above stated reasons, the Judgment that this court entered against the Defendants must be enforced. A Writ of Execution should issue.

Respectfully submitted this 11th day of September, 2008.

O'CONNOR BERMAN DOTTS & BANES,
Attorneys for Antonio S. Camacho

By: _____/s/_____
            Michael W. Dotts

080908-ReplyToOppMotionOrderInAidJudgment.doc

18